In re BLINDER, ROBINSON & COMPANY, INC., Debtor.

SECURITIES INVESTOR PROTECTION CORP., Plaintiff,

v.

BLINDER, ROBINSON & COMPANY, INC., Defendant.

Bankruptcy No. 90–12654–SBB. Adv. No. 90–1170–SBB (SIPA).

United States Bankruptcy Court, D. Colorado.

Feb. 15, 1991.

Glenn W. Merrick, William A. Bianco, Denver, Colo., for SIPA Trustee.

Kalmon Glovin, Nathan Davidovich, John Winston, Thomas Orrell, Intercontinental Enterprises, Inc., Englewood, Colo., pro se.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER comes before the Court on the Trustee's Motion to Disqualify Former Blinder Robinson Attorneys, Kalmon Glovin, Nathan Davidovich, John Winston, Thomas Orrell, and Greg Gerganoff (collectively the "Attorneys") filed November 1, 1990. The Trustee seeks to disqualify the Attorneys from representing Intercontinental Enterprises, Inc. ("IEI"), a current and substantial creditor of the Debtor estate and an affiliated company of the Debtor, Blinder, Robinson & Co., Inc. ("Debtor" or "Blinder, Robinson"). The Trustee alleges that the Attorneys should be disqualified from representing IEI, in this case and related proceedings, on the grounds that such representation creates a conflict of interest, violates the rights of confidentiality of the Debtor, impedes the Trustee's ability to effectively advance the estate's interests, and violates the Code of Professional Responsibility. The Trustee further

requests that the Attorneys, and their paralegals and staff, be enjoined from revealing confidences, secrets, and work product acquired or created while employed by Blinder, Robinson.

For the reasons set forth hereinbelow, the Court concurs with the Trustee, disqualifies the Attorneys from continued representation of IEI in this bankruptcy case and related proceedings, and enjoins the Attorneys and staff from disclosing confidential information and work product acquired while employed by Blinder, Robinson.

## I. FACTUAL BACKGROUND.

Blinder, Robinson filed a Voluntary Petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code on July 30, 1990. On August 1, 1990, Judge Zita Weinshienk of the United States District Court for the District of Colorado entered an Order which, *inter alia:* (a) decreed that the customers of the Debtor were in need of the protection afforded by the Securities Investor Protection Act, 15 U.S.C. § 78aaa *et seq.* ("SIPA"); (b) appointed Glen E. Keller, Jr. ("Keller" or "Trustee") as SIPA Trustee for the liquidation of the business of the Debtor; (c) appointed Davis, Graham & Stubbs ("DG & S") as counsel for the Trustee; and (d) removed the proceedings to this Bankruptcy Court.

The Debtor is a wholly-owned subsidiary of IEI. IEI "derives an 'overwhelming' percentage of its revenues from Blinder, Robinson, . . . although [IEI] holds at least eighty different affiliates or subsidiaries. Meyer Blinder and his wife Lillian together own about 52% of [IEI], the remainder of which is held by some 9,000 public shareholders." *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 190 (3rd Cir. 1990). IEI is also one of the Debtor's largest creditors, asserting claims in excess of $2,500,000.00

Prior to the filing of the bankruptcy Petition, Attorneys were employed by the Debtor as full-time, in-house counsel for the Debtor. The attorneys and their support staff operated out of the north wing of the ninth floor of the Blinder Building ("9–North").[1] In 9–North, the Attorneys' offices were near or adjacent to one another and had access to a library and a Westlaw terminal.

On or about July 21, 1990, Harold M. Sterling ("Sterling") was retained by the Debtor and/or Meyer Blinder to represent the Debtor in a prospective bankruptcy proceeding. On Sunday, July 22, 1990, Sterling met with Meyer and Lillian Blinder, Lisa Snyder, the Chief Financial Officer of the Debtor, and the Attorneys. Discussed were the following topics:

1. The threat that the *Walford* and *Wilson* judgments would push the Debtor into bankruptcy;
2. The effect that bankruptcy would have on the supersedeas bond that was filed with the court in *Walford* and the garnishment proceeding in *Wilson;*
3. The differences between a Chapter 7 bankruptcy and a Chapter 11 bankruptcy;
4. The possibility of SIPC involvement in the proceedings;
5. The difficulties faced by the Debtor, a "broker/dealer" in filing a Chapter 11 petition; and
6. The termination of the operation of the Debtor as a "broker/dealer."

Subsequently, Sterling, Kalmon Glovin, and Nathan Davidovich met with opposing counsel in the *Walford* case in an attempt to settle the outstanding judgment and avoid bankruptcy.

On July 24, 1990, Sterling met with certain of the Attorneys regarding the filing

---

1. Colorado Secretary of State records reflect that the following related corporations have listed the Blinder Building, 6455 South Yosemite, Englewood, Colorado 80111, as its registered office: Blinder Travel, Inc.; Blinder International Hotels, Inc.; Blinder, Robinson & Co., Inc.; Blinder, Robinson Government Securities, Inc.; Intercontinental Enterprises, Inc.; Red-mey Management, Inc.; Securities Exam Training (name reservation); and Western Ventures Capital Corp. Other related corporations in Colorado include the following: Blinder Research Foundation for Crohn's Disease; Martin Lawrence Limited Editions of Colorado, Inc.; and Martin Lawrence Museum Shops, Inc.

of a Chapter 11 petition and probable SIPC involvement. They discussed the fact that Thompson McKinnon, a New York broker/dealer, successfully filed a Chapter 11 petition without SIPC involvement. The Attorneys and/or Meyer Blinder expressed concern about the length of time and the complexity of a SIPA liquidation and decided to oppose the appointment of a SIPA Trustee and avoid SIPC involvement by removing the Debtor from broker/dealer status.

The following day, July 25, 1990, Sterling met with some of the Attorneys to discuss how certain subordinated capital loans from and a tax allocation agreement between IEI to the Debtor would be treated in a Chapter 7 bankruptcy.

On July 26, 1990, an associate of Sterling, James H. Hahn, discussed with Greg Gerganoff the possible bulk transfer of furniture and other fixtures to other entities in order to increase capital and avoid bankruptcy. Apparently, the Attorneys and Meyer Blinder disagreed as to the necessity of having a formal appraisal. The possible assignment of two accounts receivable was also discussed. The Attorneys were acutely aware that each of these transfers faced possible challenges under the Bankruptcy Code and state law as fraudulent conveyances, preferential transfers, and transfers for less than adequate consideration.

Prior to the August 1, 1990 hearing before Judge Weinshienk, Sterling discussed with certain of the Attorneys negotiations with SIPC officials to avoid SIPC involvement. SIPC had agreed to allow a Chapter 11 bankruptcy to proceed, provided a receiver would be appointed. Meyer Blinder declined the SIPC offer and instructed Sterling and the Attorneys to oppose SIPC involvement altogether.

At the hearing on August 1, 1990 in which Judge Weinshienk appointed the liquidation Trustee, Nathan Glovin argued that the court should consider the testimony of Meyer Blinder, reconsider the decision, and stay the proceedings. All of these arguments were rejected. The Attorneys researched some of the issues considered at the hearing. Following the hearing, Sterling and the Attorneys discussed the possible appeal of the SIPA liquidation and the appointment of the Trustee. Since the ruling, the Attorneys have continued to work closely with Sterling's firm, discussing the merits of the appeal, drafting pleadings, and suggesting possible arguments. The appropriateness of the SIPA liquidation is currently on appeal to the Tenth Circuit.

On August 1, 1990, following his appointment, the Trustee terminated the employment of all Blinder, Robinson employees, including the Attorneys. On the same day, IEI hired the ousted Attorneys and their support staff to serve as IEI's new in-house counsel.[2] At IEI and/or Meyer Blinder's request, the Trustee permitted the Attorneys to remain in their offices in 9–North. Since August 1, 1990, the Attorneys have been representing the interests of IEI and other related entities from those offices.

Since the Trustee's appointment, one or more of the Attorneys have attended all Trustee meetings with Meyer Blinder or former Blinder, Robinson employees. All correspondence has been through the Attorneys. With respect to the Trustee and IEI, all issues, settlements, and the sale of certain assets have been negotiated through the Attorneys. IEI has played a vigorous, often adversarial role throughout the proceedings thus far.

In late August, 1990, the Trustee advised his counsel to investigate the issue of whether there was a conflict of interest caused by the Attorneys' subsequent representation of IEI. The Trustee raised the issue with the Attorneys in telephone conversations and hearings. By way of a letter dated September 25, 1990, counsel for

---

**2.** Question: Did IEI have an in-house counsel staff prior to hiring the Attorneys; or did the Attorneys, in actuality, represent both the Debtor and IEI pre-petition and the "shift" merely represented an accounting or payroll change?

As discussed at the hearing, the particular corporate structure points to the Attorneys' potentially divided loyalties and the implicit inherent conflicts of the role of the Attorneys during the time period in question.

the Trustee demanded that the Attorneys "cease any representation of [IEI] or any other party adverse to the estate of Blinder, Robinson & Co., Inc., whether or not any court appearance is involved." On September 26, 1990, the Trustee received a letter from a Florida attorney who had represented a client against Blinder, Robinson, who was then represented by Glovin. The Florida attorney stated that he thought "that it is inappropriate for Mr. Glovin to now represent the Blinders in litigation against Blinder, Robinson & Company, which he served as general counsel."

In September, 1990, the Trustee filed an adversary proceeding to compel the surrender of documents that had been created or retained by the legal department. Judge Matheson ordered the surrender of such documents over the objection of IEI. Most of the documents were turned over to the Trustee after a lengthy review with the Attorneys.

Sterling requested that the Debtor produce a representative with working knowledge of the company at the Section 341 creditors' meeting. Nathan Davidovich appeared at the meeting as counsel for Lisa Snyder, the former Blinder, Robinson Chief Financial Officer. The proceedings were temporarily suspended when Davidovich withdrew from representation of Snyder because of a perceived conflict presented by his former representation of the Debtor and his present representation of IEI.

The Trustee filed the instant Motion to Disqualify the Attorneys and Brief in Support on November 1, 1990. SIPC filed a Memorandum in Support of the Motion on November 26, 1990. IEI filed a Response to the Motion and Memorandum Brief on November 27, 1990. At the December 4, 1990 hearing, IEI and the Attorneys represented that they were unable to retain other counsel to represent IEI. Upon IEI's request, the Court granted a ten-day continuance. At the December 14, 1990 hearing, the Trustee called two witnesses, Keller and Sterling. The Trustee's case was

uncontroverted as neither IEI nor the Attorneys chose to offer any evidence.[3]

The Trustee anticipates substantial future litigation concerning issues of alter ego, fraudulent conveyances, and preferential transfers. The Trustee alleges that the Debtor sought and followed the advice of the Attorneys on these precise issues prior to the time that the bankruptcy petition was filed. The Trustee believes that, instead of getting the full consultive support and cooperation of the Attorneys, he is receiving qualified and adversarial responses because of the loyalty that the Attorneys now have for IEI. The Trustee, therefore, seeks to disqualify the Attorneys from further representation in this and all related proceedings, and to enjoin them, their paralegals, and staff from revealing confidences, secrets, and work product acquired or created while employed by the Debtor.

## II. QUESTION PRESENTED.

Does the Attorneys' prior representation of Blinder, Robinson create a sufficient conflict of interest with their current representation of IEI such that they should be disqualified from representing IEI in bankruptcy matters?

## III. BRIEF ANSWER.

Yes, the prior representation of the Debtor is substantially related to the Attorneys' current representation of IEI and creates a conflict requiring this Court to disqualify the Attorneys from further representation of IEI in this bankruptcy case and all related proceedings.

## IV. ANALYSIS.

### A. *Timeliness.*

■ As a preliminary matter, IEI and the Attorneys contend that the instant Motion was not timely-filed and that the Trust-

---

**3.** The Attorneys decided not to testify because such testimony would: (a) require them to serve as both witness and attorney in violation of DR5–102; and (b) force them to reveal confi-
dences and secrets of IEI in violation of Canon 4. The first argument was mooted by the fact that they were not called as witnesses by the Trustee. The second argument is more telling.

ee has, therefore, waived the right to raise the issue.

Waiver is the intentional relinquishment of a known right or privilege. [Citations omitted.] A waiver may be explicit, as when a party orally or in writing abandons an existing right or privilege; or it may be implied, as, for example, when a party engages in conduct which manifests an intent to relinquish the right or privilege, or acts inconsistently with its assertions.

*Dept. of Health v. Donahue,* 690 P.2d 243, 246 (Colo.1984).

However, before "an intent to waive a benefit may be implied from conduct, the conduct itself should be free from ambiguity and clearly manifest the intention not to assert the benefit." *Id.* at 247. *See also, Lease Finance, Inc. v. Burger,* 40 Colo. App. 107, 575 P.2d 857, 862 (1977).

One court has observed that "[t]here is grave doubt whether even an express waiver by the former client could, as a matter of law, preclude this motion ... [because a] motion to disqualify may be made at almost any time before the trial and, perhaps, even during or after the trial." *Fleischer v. A.A.P., Inc.,* 163 F.Supp. 548, 559 (S.D.N.Y.1958), appeal dismissed *sub nom Fleischer v. Phillips,* 264 F.2d 515 (2nd Cir.1959), *cert. denied sub nom Fleischer v. Benjamin,* 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959) (cases cited).[4]

In any event, the Trustee's conduct does not indicate an intent to abandon his right to raise this issue. Although the Trustee has known since August 1, 1990 that the Attorneys had previously served as in-house counsel for the Debtor, the Trustee's forbearance to demand withdrawal until September 25, 1990 was not an intentional relinquishment of a known right to challenge the Attorneys' subsequent representation. The Trustee alleges that, as soon as he fully appreciated the perceived conflict of interest and the uncooperativeness of the Attorneys, he demanded an unconditional withdrawal which was refused. The Trustee's actions in this situation were not unreasonable and fail to indicate an intent to waive his right to bring the instant motion.

### B. *Uncontroverted Evidence.*

Since neither IEI nor the Attorneys put on any evidence, the Trustee contends that his evidence must be accepted by the Court. "[T]estimony as to a simple fact capable of contradiction, not incredible, and standing uncontradicted, unimpeached, and in no way discredited by cross-examination, must be taken as true." *Stone v. First Wyoming Bank, N.A., Lusk,* 625 F.2d 332, 342 n. 15 (10th Cir.1980); *Chicago, Rock Island & Pacific Ry. Co. v. Howell,* 401 F.2d 752, 754 (10th Cir.1968). The *Stone* court concluded, however, that "[e]ven where the evidence is for the most part not conflicting, this alone does not warrant taking the issues from the jury; **where the issues turn on the significance to be attached to various facts and inferences reasonable persons might draw,** the questions are for the jury." *Stone, supra* at 342 n. 15 (emphasis added).

As the application of the facts presented in the Trustee's case, although not rebutted, depends in a large part upon the inferences that the public might draw therefrom, this Court cannot make a blanket acceptance of the inferences that the Trustee suggests. Instead, the Court must make an independent assessment of the effect that such circumstances might have upon the public, the bar, and the judicial system.

---

4. This case was governed by the Canons of Professional Ethics which were superseded by the Code of Professional Responsibility on January 1, 1970. The differences are immaterial, however, "since 'Canon 4 and its subjoined rules make no changes in settled principles of ethics involving the preservation of confidential client information. These precepts have been traditional in the relationship of client and lawyer in the art of legal ethics, preserved by old Canons 6, 11, and 37.'" *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570 n. 6 (2nd Cir. 1973) (quoting R. Wise, Legal Ethics 65 (1970)).

### C. *Rights and Duties of a SIPC Trustee.*

"Essentially, a liquidation under the SIPA is a bankruptcy proceeding." *SIPC v. Ambassador Church Finance/Development Group, Inc.*, 788 F.2d 1208, 1210 (6th Cir.1986) *cert.* denied *sub nom Pine Street Baptist Church v. SIPC*, 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986). Consequently, the Trustee has "wide latitude to obtain any facts pertaining to the bankrupt's conduct or property." *In re The Investment Bankers, Inc.*, 30 B.R. 883, 886 (Bankr.D.Colo.1983). "In seeking to maximize the value of the estate, the trustee must investigate the conduct of prior management to uncover and assert causes of action against the debtor's officers and directors." *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 353, 105 S.Ct. 1986, 1993, 85 L.Ed.2d 372 (1985).[5]

> It would often be extremely difficult to conduct this inquiry if the former management were allowed to control the corporation's attorney-client privilege and therefore to control access to the corporation's legal files. To the extent that management had wrongfully diverted or appropriated corporate assets, it could use the privilege as a shield against the trustee's efforts to identify those assets. The Code's goal of uncovering insider fraud would be substantially defeated if the debtor's directors were to retain the one management power that might effectively thwart an investigation into their own conduct.

*Id.* at 353–354, 105 S.Ct. at 1993.

In order to fulfill this duty, a trustee in bankruptcy "succeeds to a debtor's right to assert or waive the attorney-client privilege." *Investment Bankers, supra* at 886; *Gekas v. Pipin*, 69 B.R. 671, 672 (N.D.Ill. 1987).

### D. *Code of Professional Responsibility.*

The U.S. District Court for the District of Colorado Local Rule 306 states that "[t]he Code of Professional Responsibility published as Appendix A to these Local Rules of Practice is adopted by the court as the standard of professional conduct." Appendix A reads, "[t]he Code of Professional Responsibility adopted by the Supreme Court of Colorado (as amended) applies to all attorneys appearing in this court."[6] *Accord, e.g. In re South Pacific Island Airways*, 68 B.R. 574, 576 (Bankr.D.Hawaii 1986) (the Code of Professional Responsibility acts as "a guideline for the federal courts to follow in regulating their affairs and is applicable in bankruptcy proceedings") (cases cited); *Matter of Davis*, 40 B.R. 163, 165 (Bankr.M.D.Ga.1984) (the Code of Professional Responsibility "governs the conduct of lawyers practicing before the federal courts, and it is a guideline for the federal courts to follow in the regulation of their affairs ... [and] is applicable to the disqualification of attorneys in bankruptcy proceedings") (cases cited).

"The primary responsibility for controlling the conduct of lawyers practicing before the district court rests with that court." *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir.1980). "The federal courts have inherent power to regulate the admission, practice and discipline of attorneys.... In appropriate instances this power may be used to disqualify an attorney from representing a client on the basis of a conflict of interest." *In re Ram Manufacturing, Inc.*, 49 B.R. 53, 55 (Bankr.E.D.Pa.1985).

▬ Because it is the "nondelegable duty" of the Court to obtain adherence of its bar to proper ethical standards, the consent of the adverse party will not necessarily compel the Court's assent to the contin-

---

5. The significance that the Attorneys' prior status may have on the case is illustrated in the area of discovery by *NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 132 (2nd Cir.1976) (the subject information is material in which one party would be vitally interested and "entitled to the benefit [of], irrespective of any taint arising from employment ... or disclosure ... (outside the scope of ordinary discovery).").

6. The preamble to the local rules of bankruptcy practice incorporates the District Court rules. "These Rules are designed to supplement the Bankruptcy Rules promulgated by the Supreme Court of the United States, and any Local Rules of the District Court for the District of Colorado which may be made applicable to the practice before the bankruptcy court by order of the district court."

uation of a flagrant conflict of interest.[7] Conversely, the withholding of consent by the adverse party will not be binding on the Court if it subsequently appears to have been unjustified, whether or not it may have been justified initially. *Kesselhaut v. U.S.*, 214 Ct.Cl. 124, 555 F.2d 791, 794 (1977).

■ Disqualification of counsel is tempered by a need to balance a variety of competing and complex concepts. *See e.g., South Pacific Island Airways, supra; Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715 (7th Cir.1982); *State of Arkansas v. Dean Foods Products Co.*, 605 F.2d 380 (8th Cir.1979) overruled on appealability issue *sub nom In re Multi–Piece Rim Products Liability Litigation*, 612 F.2d 377, 378 (8th Cir.1980) vacated *sub nom Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); *Hull v. Celanese Corp.*, 513 F.2d 568 (2nd Cir.1975); *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562 (2nd Cir.1973).

> Disqualification in spasm reaction to every situation capable of appearing improper to the jaundiced cynic is as goal-defeating as failure to disqualify in blind disregard of flagrant conflicts of interest. Between those ethical extremes lie less obvious influences on the interest of society in the orderly administration of justice, on the interest of clients in candid consultation and choice of counsel, and on the interest of the legal profession in its reputational soul.

*State of Arkansas, supra* at 383.

"[D]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary." *Freeman, supra* at 721.

However, "[t]he preservation of public trust both in the scrupulous administration of justice and in the integrity of the bar is paramount. [Considerations of judicial

economy and the right to counsel of one's own choosing] must yield ... to considerations of ethics which run to the very integrity of our judicial process. *Hull, supra* at 572.

> Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case.

*Emle Industries, supra* at 571.

■ Consequently, any doubt should be resolved in favor of disqualification. (*See, e.g., Twin Laboratories, Inc. v. Weider Health & Fitness*, 1989 WL 49368 (S.D. N.Y.1989); *South Pacific Island Airways, supra* at 576; *Davis, supra* at 166; *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir.1978); *Hull, supra* at 571)), but the party seeking disqualification must carry a "heavy burden" (*Vegetable Kingdom, Inc. v. Katzen*, 653 F.Supp. 917, 922 (N.D.N.Y.1987)) and meet a "high standard of proof" before a lawyer will be disqualified. *Evans v. Artek Systems Corp.*, 715 F.2d 788, 791 (2nd Cir. 1983) (citing *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2nd Cir.1978)); *cf. Fleischer, supra* (preponderance of the evidence); *Consolidated Theatres, Inc. v. Warner Brothers Circuit Management Corp.*, 216 F.2d 920, 924 (2nd Cir.1954) (proof which is at least sufficient

---

7. **Conflicts** which may arise between IEI and the Trustee over issues like the value of the properties must be distinguished from any **conflict of interest** which may arise as a result of the Attorneys' prior representation of the Debtor and their current representation of IEI. *See In re Peck*, 112 B.R. 485, 491 (Bankr.D.Conn.1990).

to support a reasonable inference of a violation). Mere speculation will not suffice. *Twin Laboratories, supra* (citing *International Union, United Automobile Aerospace and Agricultural Implement Workers of America (UAW) v. National Caucus of Labor Committees,* 466 F.Supp. 564, 570 (S.D.N.Y.) *aff'd* 607 F.2d 996 (2nd Cir.), *cert.* denied, 444 U.S. 839, 100 S.Ct. 77, 62 L.Ed.2d 51 (1979)).

1. Canon 4.

The Trustee asserts that disqualification is mandated by Canon 4 of the Code of Professional Responsibility, "a lawyer should preserve the confidences and secrets of a client." Disciplinary Rule 4–101 reads in pertinent part as follows:

*DR4–101 Preservation of Confidences & Secrets of a Client.*

(A) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate or the disclosure of which would be embarrassing or would be likely to be detrimental to the client.

(B) Except when permitted under DR 4–101(C), a lawyer shall not knowingly:

(1) Reveal a confidence or secret of his client.

(2) Use a confidence or secret of his client to the disadvantage of the client.

(3) Use a confidence or secret of his client for the advantage of himself or of a third person, unless the client consents after full disclosure.

■ Canon 4 prevents a lawyer from representing a client in a legal action against one of his former clients where there is a substantial relationship between the two representations. *See, e.g. Davis, supra* at 165. Included in any analysis are the following three basic determinations: (1) whether an attorney-client relationship was established in the first representation; (2) whether the subsequent position is essentially adversarial to the former; and (3) whether there is a substantial relationship between the two representations.

*a. Attorney–Client Relationship.*

"Because Canon 4 is limited by its language to the duty of the lawyer to his client, [citation omitted] one who seeks to employ Canon 4 to disqualify opposing counsel must show that counsel to have, or to have had, an attorney-client relationship with an adverse party in the present suit." *Fred Weber, Inc. v. Shell Oil Co.,* 566 F.2d 602, 607–608 (8th Cir.1977) *cert.* denied, 436 U.S. 905, 98 S.Ct. 2235, 56 L.Ed.2d 403 (1978); *In re Graff Marketing Corp.,* 42 B.R. 801, 805 (Bankr.S.D.N.Y.1984). Clearly, the Attorneys enjoyed an attorney-client relationship with the Debtor.[8]

*b. Adversarial.*

The Trustee asserts that the Attorneys are hindering rather than assisting the Trustee in gathering the property of the estate, based primarily upon information which they gained as in-house counsel. Further, the Trustee alleges that the Attorneys have not fulfilled their responsibilities under B.R. 4002 and that their new employment prevents them from doing so. The Court has observed and the file reflects that the Attorneys, in representing IEI, have frequently been energetic, contentious, and combative, as well as counterproductive, to the process of case administration and estate economy.

**8.** There is a real question as to whether the Attorneys actually represented the Debtor **and** others such as IEI on an informal joint basis. One court responded to the assertion that no confidences can arise as between joint clients as follows: "This argument, in our view, interprets too narrowly an attorney's duty.... The fundamental flaw in defendants' position is a confusion of the attorney-client evidentiary privilege with the ethical duty to preserve a client's confidences.... [T]he ethical duty is broader than the evidentiary privilege.... The need to safeguard the attorney-client relationship is not diminished by the fact that the prior representationn [sic] was joint with the attorney's present client." *Brennan's, Inc. v. Brennan's Restaurants, Inc.,* 590 F.2d 168, 171–172 (5th Cir.1979). *See also,* ABA Code of Professional Responsibility, EC 4–4 ("This ethical precept, unlike the evidentiary privilege, exists without regard to the nature or source of information or the fact that others share the knowledge.")

■ There is no requirement that the subsequent representation strike a totally adversarial posture. It should be enough that the two positions are not exactly aligned. Although the Attorneys allege that all of their efforts have been directed toward achieving a greater payout for all of the creditors, it is certainly apparent that the interests will quickly become adverse, or more accurately more adverse, for example, in the event that the Trustee attempts to set aside certain transfers as preferential.

### c. *Substantial Relationship.*

"The merits of this disqualification motion depend on whether a substantial relationship exists between the pending suit and the matter in which the challenged attorney previously represented the client." *Smith v. Whatcott*, 757 F.2d 1098, 1100 (10th Cir.1985). The term "substantially related" first appeared in *T.C. Theatre Corp. v. Warner Brothers Pictures*, 113 F.Supp. 265, 269, rehearing denied 125 F.Supp. 233 (S.D.N.Y.1953).

■ The substantial relationship test is not a rule of substantive law but a measure of the quantum of evidence required for proof of the existence of the professional obligation. *Westinghouse Electric, supra* at 224. It is more than a mere mathematical evaluation of how much time is spent on an issue. *Novo Terapeutisk Laboratorium A/S v. Baxter Travenol Laboratories, Inc.*, 607 F.2d 186, 189 (7th Cir.1979).

■ "In determining whether there is a substantial relationship, similarities between the two factual situations and the legal questions posed must be considered." *Food Brokers, Inc. v. Great Western Sugar Co.*, 680 P.2d 857, 858 (Colo.App.1984). Identical legal issues are not necessary to satisfy the test once it is shown that the same significant factual subject matter is common to both engagements. *Graff Marketing, supra* at 807. *Accord, In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1346 (5th Cir.1981), overruled on appealability issue, *Gibbs v. Paluk*, 742 F.2d 181, 185 (5th Cir.1984) ("It need only be akin to the present action in a way reasonable persons would understand as important to the issues resolved."); *Trone, supra* at 998 (a substantial relationship exists "if the factual contexts of the two representations are similar or related"); *Trone, supra* at 1000 (finding a substantial relationship "does not require that the issues in the two representations be identical"); *Osborn v. District Court, Fourteenth Judicial District*, 619 P.2d 41, 47 n. 10, 48 (Colo.1980) (the term "substantially related" is equivalent to the expression "facts of which are somewhat interwoven" or similar factual situations and legal questions); *Fleischer, supra* at 553 ("Only where it is clearly discernible that the issues involved in a current case do not relate to matters in which the attorney formerly represented the adverse party will the attorney's present representation be treated as measuring up to the standard of legal ethics.")

This is especially so "in cases where the former engagement was that of general counsel, or sole attorney on numerous matters." *Graff Marketing, supra* at 807. *Accord, In re Kujawa*, 112 B.R. 968, 972 (Bankr.E.D.Mo.1990) (attorneys had an intimate knowledge of personal and business dealings of their former corporate client); *Matter of Davenport Communications Limited Partnership*, 109 B.R. 362, 364 (Bankr.S.D.Iowa 1990) (general counsel was in a position to advise as to the validity of the organization of the entities and the adequacy of their capitalization); *In re California Canners & Growers*, 74 B.R. 336, 346 (Bankr.N.D.Cal.1987) ("in actions of this type, access to the 'business thinking' of the banks regarding its lending practices is particularly important"); *Interco Systems, Inc. v. Omni Corporate Services, Inc.*, 733 F.2d 253, 255 (2nd Cir.1984) (former general counsel should not assert claims against the company which are based in significant part on events occurring while it represented the company); *Evans, supra* at 792; *Global Van Lines, Inc. v. Superior Court, County of Orange*, 144 Cal.App.3d 483, 192 Cal.Rptr. 609, 613 (1983) ("A corporate general counsel is the legal advisor to the firm's top

management and **in the absence of proof to the contrary** it must be presumed that ... [he] acquired substantial knowledge of the policies, attitudes and practices of ... management....") (emphasis added); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1032 (5th Cir.1981) *cert.* denied 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981), (merely alleging knowledge of "practices and procedures" is insufficient, must prove the attorney has knowledge of the particular practices and procedures which are the subject of the suit); *Trone, supra* at 1001 (where attorney had the opportunity to learn of policies, practices, and procedures, "[t]he ethical obligations ... require us to protect against any possibility that this information, if acquired, might be used against the former client").

> [I]f significant events giving rise to the instant lawsuit overlap with a prior engagement of general counsel or acting as sole lawyer for the client, a substantial relationship **should be inferred subject to proof** that the relationship of the now adverse parties was not discussed with such counsel during the engagement.
>
> *Graff Marketing, supra* at 807 (emphasis added).

■ "Once a substantial relationship has been found, a presumption arises that a client has indeed revealed facts to the attorney that require his disqualification." *Smith, supra* at 1100. The presumption is irrebuttable. *Id.*[9] This presumption is intended to protect the subject confidences by not requiring that specific examples be disclosed. *Cf. T.C. Theatre, supra* at 268–269.

■ Despite the fact that all of the information obtained by the Attorneys from the Debtor may be available to IEI through other sources or channels, e.g., Meyer Blinder, the Attorneys must, nevertheless, be disqualified. *Fleischer, supra* at 551 (because the courts are more concerned with the avoidance of the appearance of evil than with an actual unfair or unethical use of confidential information). *Accord, NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 133 (2nd Cir.1976); *Doe v. A Corp.*, 330 F.Supp. 1352, 1356 (S.D.N.Y.1971) affirmed *sub nom Hall v. A Corp.*, 453 F.2d 1375 (2nd Cir.1972); *Matter of Global Video Communications Corp.*, 102 B.R. 868, 871 (Bankr.M.D.Fla.1989) ("The fact that [the defendant] may be able to tell another attorney everything which [his current attorney] knows about Debtor is not a defense to ... disqualification."); *South Pacific Island Airways, supra* at 576 ("The fact that the same information could have been obtained through discovery or public records is not a sufficient basis for denying a motion for disqualification."); *Graff Marketing, supra* at 806 (quoting *Emle Industries, supra* at 572–573).

### d. *Conclusion.*

"Nowhere is Shakespeare's observation that 'there is nothing either good or bad

9. *Accord, Matter of Davis*, 40 B.R. 163, 166 (Bankr.M.D.Ga.1984); *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1347 (5th Cir.1981) overruled on appealability issue *Gibbs v. Paluk*, 742 F.2d 181, 185 (5th Cir.1984). *But see, In re Sharpe*, 98 B.R. 337, 340 (N.D.Ill.1989); *In re Graff Marketing Corp.*, 42 B.R. 801, 805 (Bankr.S.D.N.Y.1984). *Fleischer v. A.A.P. Inc.*, 163 F.Supp. 548, 552 (S.D.N.Y.1958), appeal dismissed *sub nom Fleischer v. Phillips*, 264 F.2d 515 (2nd Cir.1959), *cert.* denied *sub nom Fleischer v. Benjamin*, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959) set forth a possible explanation for the discrepancy. The court explains that the presumption is generally treated as irrebuttable except where the attorney may be vicariously disqualified by virtue of his former membership in a firm. In the latter cases, the inference is treated as rebuttable. *See also* the "peripheral representation" exception presented in *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.*, 518 F.2d 751 (2nd Cir.1975), overruled on other grounds, *Armstrong v. McAlpin*, 625 F.2d 433 (2nd Cir.1980), vacated on other grounds, 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981); *State of Arkansas v. Dean Foods Products Co.*, 605 F.2d 380, 382 (8th Cir. 1979), overruled on appealability issue *In re Multi–Piece Rim Products Liability Litigation*, 612 F.2d 377, 378 (8th Cir.1980), vacated *sub nom Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981); *Westinghouse Electric Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 223 (7th Cir.1978). In the instant case, the apparent split is immaterial because neither IEI nor the Attorneys presented rebuttal evidence. *Accord, In re Ram Manufacturing, Inc.*, 49 B.R. 53, 56 (Bankr.E.D.Pa.1985); *Kevlik v. Goldstein*, 724 F.2d 844, 849 n. 5 (1st Cir. 1984).

but thinking makes it so,' more apt than in the realm of ethical considerations." *Emle Industries, supra* at 571. A "lawyer should avoid representation of a party in a suit against a former client, where there may be the appearance of a possible violation of confidence, even though this may not be true in fact." ABA Standing Committee on Professional Ethics, Informal Opinion No. 885 (11-02-65).

"Courts do not generally examine the motives of a moving party in a disqualification motion. Once the preliminary showing is made by the former client, the motion must be granted regardless of whether the former client gains an advantage at the expense of his adversary." *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 90, rehearing denied 536 F.2d 1025 (5th Cir.1976). Neither does a court need to examine the subjective good faith of the attorney in question. *Graff Marketing, supra* 807; *Davis, supra* at 166 ("The Court notes in closing that it does not question the good faith of [the subject attorney]. The canons of ethics are guidelines for professional conduct, and public confidence in the judicial system demands that they be strictly applied."); *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382, 1385 (3rd Cir.1972), *cert.* denied, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973) ("we do not believe that he should be permitted to place himself in a position where, even unconsciously, he will be tempted, or it appears to the public and his former clients that he might be tempted, in the interests of his new client, to take advantage of information derived from confidences placed in him."); *In re Philadelphia Athletic Club, Inc.,* 20 B.R. 328, 334–335 (E.D.Pa.1982) ("Even the 'most rigorous self-discipline' will not prevent [the attorney's] judgment from being influenced by his experience as an advocate for a competing interest.").

"For a law firm to represent one client today, and the client's adversary tomorrow in a closely related matter, creates an unsavory appearance of conflict of interest that is difficult to dispel in the eyes of the lay public—or for that matter the bench and bar—by the filing of affidavits, difficult to verify objectively, denying that improper communication has taken place or will take place between the lawyers in the firm handling the two sides." *Analytica, Inc. v. NPD Research, Inc.,* 708 F.2d 1263, 1269 (7th Cir.1983). "[N]o countervailing policy considerations outweigh the strong presumption in favor of disqualification. In the classic words of Chief Judge Cordozo of more than a half century ago, in a different context, '[n]ot honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.' [Footnote omitted.] That is the standard to which we think lawyers in the federal courts should be held." *In re Freedom Solar Center, Inc.,* 776 F.2d 14, 19 (1st Cir.1985) (quoting *Meinhard v. Salmon,* 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)).

It is clear from the reaction of the bar as represented by the letter from the Florida attorney as well as the considerable attention that this Court has spent on the issue, that the appearance of a possible violation is present. This position is further supported by the uncontroverted evidence that the Attorneys acted as in-house counsel for the Debtor during the time that potentially avoidable transfers took place and, in many instances, materially participated in the decisions made. This Court is compelled to find that the Attorneys must be disqualified.

2. Canon 9.

Alternatively, the Trustee alleges that disqualification is necessitated by Canon 9 of the Code of Professional Responsibility, "a lawyer should avoid even the appearance of professional impropriety."

"The proper standard for disqualification under Canon 9, in our view, is whether a reasonable appearance of impropriety exists." *Osborn, supra* at 47. To sustain a motion for disqualification, some courts have held that a movant must show that there is a reasonable possibility of the occurrence of a "specific[ally] identifiable impropriety" and that the likelihood of public suspicion or obloquy outweighs the so-

cial interest in obtaining counsel of one's choice. *Food Brokers, supra* at 859. *Accord, Corrugated Container Antitrust Litigation, supra* at 1345; *Woods v. Covington County Bank,* 537 F.2d 804, 813 (5th Cir.1976). *But see, Fred Weber, supra* at 609 ("Unlike those of Canons 4 and 5, the broad injunction of Canon 9 against the 'appearance of impropriety' relates to the entire spectrum of lawyer conduct. That no unethical or untoward act may have occurred is implicit in the canon's emphasis on 'appearance.' The conduct under scrutiny must therefore be evaluated in an 'eye of the beholder' context, and the lawyer must be disqualified when an actual appearance of evil exits, though there be no proof of actual evil.").

Colorado courts have not uniformly required the proving of a "specific identifiable impropriety." *Food Brokers, supra* at 859 (tying disqualification under Canon 9 to the proof of disqualification under Canon 4 or another Canon). A reasonable inference can be made that a decision to disqualify an attorney may be based solely upon Canon 9. *Osborn, supra* at 45, 45 n. 5 ("Our decision today rests solely on Canon 9...."). *Accord, Crawford W. Long Memorial Hospital of Emory University v. Yerby,* 258 Ga. 720, 373 S.E.2d 749, 750–751 (1988). This Court, however, need not reach this issue as it has already found a violation under Canon 4 which creates an overwhelming appearance of impropriety.

### E. *Scope of Requested Relief.*

The Trustee seeks to disqualify the Attorneys from further representation in this and all related proceedings, and to enjoin them, their paralegals, and staff from revealing confidences, secrets, and work product acquired or created while employed by the Debtor.

Courts have prohibited the turn-over to successor attorneys of all work product. *See, EZ Paintr Corp. v. Padco, Inc.,* 746 F.2d 1459, 1463 (Fed.Cir.1984); *First Wisconsin Mortgage Trust v. First Wisconsin Corp.,* 584 F.2d 201, 202 (7th Cir.1978) (" 'If any attorney's subsequent adverse representation in the form of his work product is not barred from use by substitute counsel, then there is little or no point in the initial disqualification.' ") (quoting the district court opinion).

The Attorneys contend that the Trustee has failed to present evidence of the existence of a specific pending matter, suit, case or controversy between the parties other than in an appellate context, alleged by them to be an essential element in determining disqualification. The Attorneys allege that the Trustee wrongfully requests some sort of blanket disqualification which is outside of the authority of this Court to issue. The argument has two principal flaws.

■ First, conflicts of interest arising on appeal do not necessarily present less of a threat to client confidentiality than do conflicts perceived at the trial or pretrial stage. "Whatever merit this argument has is outweighed here by the absence of institutional mechanisms to prevent or detect conflicts of this kind and the necessity of avoiding the appearance of impropriety. We note, moreover, that most appeals involve some issues that potentially could require reversal and retrial.... Should a reversal result in a new trial, [the attorney's] confidential knowledge would be highly relevant." *Smith, supra* at 1102.

Finally, the Attorneys overlook the fact that the bankruptcy/SIPA proceeding itself is a pending matter. Any adversary proceedings filed related thereto are intertwined with and dependent upon the underlying case.[10] It would be absurd to require the Trustee to make repetitive motions to disqualify the Attorneys when the scope of their prior representation was patently all-encompassing, pervasive, and inclusive of many areas that the Trustee has represented may soon be explored by this Court.

It is not a question of the game being over if the Attorneys are disqualified. It is

---

10. Of course, under the circumstances of a SIPA liquidation, the underlying case is designated as an adversary proceeding as well.

a question of leveling the playing field in terms of access to information that the Debtor paid to create or obtain and to which the Trustee is entitled in order to properly fulfill his duties.

For the reasons set forth hereinabove,

IT IS ORDERED, AND JUDGMENT SHALL ENTER ACCORDINGLY, that the former Blinder, Robinson attorneys, Kalmon Glovin, Nathan Davidovich, John Winston, Thomas Orrell, and Greg Gerganoff are disqualified, and shall hereby be prohibited, from representing Intercontinental Enterprises, Inc. in the within bankruptcy case and all related proceedings.

IT IS FURTHER ORDERED that each of the Attorneys, Kalmon Glovin, Nathan Davidovich, John Winston, Thomas Orrell, and Greg Gerganoff, and their paralegals and staff, are hereby enjoined, absolutely, from revealing confidences, secrets, and work product acquired or created while employed by Blinder, Robinson.